UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 3:20-cr-53 |
| | ) Judges JORDAN / POPLIN |
| EARL PRATT | ) |

PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of Tennessee, the defendant, EARL PRATT, and the defendant's attorney, Matthew S. Chester, Esq., have agreed upon the following:

1. The defendant will waive indictment and arraignment and plead guilty to an information charging defendant with the following offense:

    (a) Count One – Conspiracy to Pay, Solicit, and Receive Kickbacks: the defendant knowingly, intentionally, and unlawfully conspired with one or more other persons to Offer and Pay, and Solicit and Receive kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(B), (b)(2)(B), and one or more such persons did an act to effect the object of the conspiracy, all in violation of 18 U.S.C. § 371.

    The maximum punishment for this offense is five years' imprisonment, a $250,000 fine, three years' supervised release, and a $100 mandatory assessment.

2. In consideration of defendant's guilty plea, the United States agrees not to further prosecute defendant in the Eastern District of Tennessee for any other non-tax criminal offenses committed by defendant that are related to the charges contained in the information and that are known to the United States Attorney's Office for the Eastern District of Tennessee at the time this plea agreement is signed by both parties.

1

3. The defendant has read the information, discussed the charges and possible defenses with defense counsel, and understands the crimes charged. Specifically, the elements of the offense are as follows:

   (a) Count One – Conspiracy to Pay, Solicit, and Receive Kickbacks, in violation of 18 U.S.C. § 371:

   (i) two or more persons conspired or agreed to commit the crime of Payment, Solicitation, or Receipt of Health Care kickbacks, in violation 42 U.S.C. § 1320a-7b(b)(1)(B), (b)(2)(B);

   (ii) the defendant knowingly and voluntarily joined the conspiracy; and

   (iii) a member of the conspiracy did an overt act for the purpose of advancing or helping the conspiracy.

4. In support of defendant's guilty plea, the United States and defendant agree and stipulate to the following facts, which satisfy the elements of the offense. These are the facts submitted for purposes of defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

   (a) During the duration of the conspiracy, from on or about July 2018 to on or about May 2019, defendant EARL PRATT was the owner and operator of Florida Primary Sourcing, LLC ("Florida Primary Sourcing"), a Florida registered business entity doing business in Boca Raton, Florida.

   (b) From on or about July 2018 to on or about May 2019, an individual whose initials are V.H. was the owner and operator of Smart Support Professionals, LLC ("Smart Support Professionals"), a North Dakota registered business entity doing business in Boca Raton, Florida.

   (c) From on about July 2018 through on or about May 2019, a person whose initials are I.C., and who resides in the Eastern District of Tennessee, directed the operations of

2

Tennessee Premier Care ("TN Premier Care") by, for example, executing contracts and authorizing and signing checks on its behalf.

(d) In his role as owner and operator of Florida Primary Sourcing, defendant received monies from I.C., through TN Premier Care, which he, in turn, transferred to V.H., through Smart Support Professionals, for signed doctors' orders for durable medical equipment ("DME").

(e) V.H. acquired signed doctors' orders for DME by purchasing a "lead"—that is, a recorded call between a call-center employee and a Medicare beneficiary—and then arranging for a license medical professional to sign an order for DME based on the lead.

(f) V.H., through Smart Support Professionals, then submitted the signed doctors' orders to a cloud-based document storage system to which defendant, V.H., I.C. and others had access. I.C, through TN Premier Care, then submitted, or caused the submission of, the signed doctors' orders to Medicare for reimbursement. Oftentimes, Company B, which specialized in submitting claims to Medicare for reimbursement, and purported to conduct back-end customer service operations, accessed the shared cloud-based storage system and submitted the signed doctors' orders for DME to Medicare on TN Premier Care's behalf.

(g) Defendant, I.C., and V.H., agreed on an operating plan to accomplish the purpose of the scheme, which they implemented as follows: defendant, through Florida Primary Sourcing, received money from I.C., through TN Premier Care, which defendant transferred to V.H, through Smart Support Professionals. In return, V.H. acquired doctors' orders for DME, which I.C. and others submitted, or caused to be submitted, to Medicare for reimbursement. In exchange for his role in receiving and transferring money from I.C. to V.H., defendant received a kickback determined by V.H. depending on the DME product that was ordered by the doctor. For

3

example, if a doctor signed an order for a neck brace, defendant received $25; if a doctor signed an order for a back brace, defendant received $15. During and throughout the conspiracy, defendant received approximately 10% of the total amount of money transferred from I.C. to V.H.

(h) Defendant, I.C., V.H., and others, entered into contracts that disguised the kickbacks as legitimate payments for marketing and business-consulting services when, in fact, the payments were for completed doctors' orders for DME.

(i) From on or about July 2018 to on or about May 2019, defendant, through Florida Primary Sourcing, introduced I.C. and TN Premier Care to V.H. and Smart Support Professionals. Defendant subsequently received kickbacks and bribes in the amount of approximately $833,890 from I.C. and others. Those monies were then transferred by defendant to V.H., through Smart Support Professionals, in exchange for doctors' orders for DME. Some of those payments received by defendant from I.C., and then transferred to V.H. in exchange for signed doctors' orders for DME, include, but are not limited to, the following:

(1) On or about August 7, 2018, I.C. through TN Premier Care, transferred $4,500 to defendant, through Florida Primary Sourcing. Six days later, on or about August 13, 2018, defendant, through Florida Primary Sourcing, transferred approximately $5,800 to V.H. and Smart Support Professionals. The monies paid and transferred were for signed doctors' orders for DME.

(2) On or about August 13, 2018, I.C., through TN Premier Care, transferred $7,100 to defendant, through Florida Primary Sourcing. Seven days later, on or about August 20, 2018, defendant, through Florida Primary Sourcing, transferred $5,900 to V.H. and Smart Support Professionals. The monies paid and transferred were for signed doctors' orders for DME.

(3) On or about August 20, 2018, I.C., through TN Premier Care, transferred $7,000 to defendant and Florida Primary Sourcing. Seven days later, on or about August 27, 2018, defendant, through Florida Primary Sourcing, transferred $5,200 to V.H. and Smart Support Professionals. The monies paid and transferred were for signed doctors' orders for DME.

4

(4) Over the course of three transactions in December, 2018—i.e., December 3, 11, and 26—I.C., through TN Premier Care, transferred $55,000 to defendant, through Florida Primary Sourcing. On or about January 4, 2019, defendant, transferred $45,000 to V.H. and Smart Support Professionals. The monies paid and transferred were for signed doctors' orders for DME.

(5) Over the course of two transactions on February 11 and 12, 2019, I.C., through TN Premier Care, transferred $25,000 to defendant, through Florida Primary Sourcing. Over the course of two transactions on February 22 and 25, 2019, defendant transferred $21,980 to V.H., through Smart Support Professionals. The monies paid and transferred were for signed doctors' orders for DME.

(j) From on or about July 2018 to on or about May 2019, defendant, through Florida Primary Sourcing, received approximately $300,000 from I.C., through TN Premier Care, which defendant transferred to V.H., through Smart Support Professionals, in exchange for signed doctors' orders for DME.

(k) From in or about July 2018 to in or about May 2019, I.C. submitted and caused to be submitted, through TN Premier Care, claims to Medicare for DME, for which TN Premier Care was reimbursed hundreds of thousands of dollars. Of the claims submitted to Medicare by TN Premier Care during that time, most of the claims, if not all, were signed doctors' orders that I.C. purchased from V.H. and Smart Support Professionals through the defendant.

(l) In or around July 2018, defendant signed a Marketing Services Agreement with Company A that falsely stated that Florida Primary Sourcing would provide "specialty marketing services" to Company A when, in reality, Florida Primary Sourcing provided only services directly related to the DME kickbacks conspiracy, including (i) arranging for Company A to receive signed doctors' orders for DME from V.H., through Smart Support Professionals; (ii) responding to emails from Individual 1, I.C., and others to discuss the amount of kickbacks for each signed doctor's order; (iii) reviewing complaints from Medicare beneficiaries who had received DME they did not want and coordinating responses from I.C., Individual 1, and others;

5

and (iv) acting as a liaison between V.H., who acquired the signed doctors' orders for DME, and I.C. and Individual 1, who submitted or caused to be submitted the signed orders to Medicare for reimbursement.

(m) During the pertinent time period, defendant was a party to a number of email communications concerning the submitted claims for DME. For example:

(1) On July 26, 2018, Individual 1 emailed I.C. and defendant to inquire whether they had received any reimbursement checks from Medicare, to which I.C. responded, on the same day, "We are keeping an eye out for ALL checks regarding DME."

(2) On August 15, 2018, I.C. emailed an employee with Company B and defendant to inform them that I.C. had received a message from a Medicare beneficiary "requesting a return shipping label to return a brace he did not order." I.C. requested that Company B "reach out to [the beneficiary] to address his concerns."

(3) On or about August 30, 2018, I.C. emailed an employee with Company B and defendant, stating, "We have someone who claims a brace was sent to her mother. She apparently did not expect to receive a brace and will dis-guard [sic] the brace if someone does not call her about it today. . . . Also I have a brace that appears to have been sent back to my office. . . . What should I do with this package?"

(4) On September 20, 2018, I.C. emailed an employee with Company B, Individual 1, and defendant, stating, "I just uploaded more EOB and checks to the Shared Dropbox."

(5) On September 20, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, stating, "I have a patient that claims he did not expect the brace he received. . . . Who [sic] someone please call this patient to see what happened?"

(6) On or about September 25, 2018, I.C. emailed an employee with Company B, Individual 1, and defendant, stating that a beneficiary who had received a DME orthotic contacted TN Premier Care to complain that "he did not order a back support brace. His comment was 'this is a fraud.'"

(7) On September 26, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, stating, "We received a call from

6

a patient claiming not having ordered braces (BACK & SHOULDER)."

(8) On October 3, 2018, defendant emailed Individual 1 and an employee with Company B to inform them that all of TN Premier Care's signed doctors' orders for DME "are coming through my sources, so it would be easy for me track."

(9) On October 4, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, informing them that three Medicare beneficiaries had contacted TN Premier Care complaining that they had received DME orthotics that they did not order.

(10) On October 18, 2018, I.C. emailed Individual 1, defendant, and an employee of Company B, stating, "Attached are correspondence from payors regarding pay backs and audits. Please review. This information is also in the Dropbox folder." The subject line of the email stated, "CMS Audits / Pay backs."

(11) On October 25, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, informing them that TN Premier Care had received returns of DME orthotics from two Medicare beneficiaries who had refused to accept delivery of the DME.

(12) On October 31, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, informing them that two Medicare beneficiaries contacted TN Premier Care, one of whom stated that "he did not want the brace to begin with," and the other who returned the DME orthotic to TN Premier Care.

(13) On November 6, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, informing them that two Medicare beneficiaries contacted TN Premier Care, one of whom had "receive[d] a back brace yesterday and another back brace today. She does not want either one and wishes to return them." The other beneficiary stated that she wanted to return the brace.

(14) On December 10, 2018, I.C. emailed Individual 1, an employee with Company B, and defendant, stating, "I have several returned items," and indicating that three Medicare beneficiaries had returned DME orthotics to TN Premier Care.

(n) In or about April 19, 2019, defendant electronically signed a Consulting Agreement on behalf of Florida Primary Sourcing that, on paper, required Florida Primary Sourcing to provide consulting and advisory services to TN Premier Care. I.C. drafted the

7

Agreement and asked defendant to sign it. The Agreement stated that Florida Primary Sourcing would be compensated for "developing future and current patient services and marketing ... via telephone or other forms of remote correspondence" for TN Premier Care. TN Premier Care agreed to compensate Florida Primary Sourcing on a monthly basis to "reflect[] the potential of ideas and opportunities employed." The Agreement was back-dated to reflect that it was effective as of September 1, 2018. I.C. told defendant the Agreement would reflect their past business relationship and any future business relationship. In fact, the Agreement did not change or alter defendant's preexisting agreement with I.C., the purpose of which was for defendant to transfer to V.H. money he received from I.C., in exchange for V.H.'s providing to I.C. signed doctors' orders for DME.

(o) Defendant's participation in the unlawful kickback scheme with V.H., I.C., Companies A and B, and Individual 1; and his participation in other similar schemes with V.H., Companies A and B, and Individual 1; resulted in his receipt of $144,901 in wrongful proceeds.

(p) Defendant admits that he knowingly and willfully received kickbacks in the form of money from V.H. for transferring money from I.C. to V.H., to induce V.H. to provide to I.C. signed doctors' orders for DME, for which payment was to be made by Medicare, a federal health care program.

(q) Defendant also admits that he knowingly and willfully transferred kickbacks in the form of money from I.C. to V.H., to induce V.H. to provide to I.C. signed doctors' orders for DME, for which payment was to be made by Medicare, a federal health care program.

5. Defendant is pleading guilty because defendant is in fact guilty. Defendant understands that, by pleading guilty, he is giving up several rights, including:

(a) the right to be indicted by a grand jury for these crimes;

8

(b) the right to plead not guilty;

(c) the right to a speedy and public trial by jury;

(d) the right to assistance of counsel at trial;

(e) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

(f) the right to confront and cross-examine witnesses against the defendant;

(g) the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

(h) the right not to testify and to have that choice not used against the defendant.

6. The parties agree that the appropriate disposition of this case would be the following as to each count:

(a) The Court may impose any lawful term of imprisonment, any lawful fines, and any lawful terms of supervised release up to the statutory maximums.

(b) The Court will impose special assessment fees as required by law.

(c) The Court may order forfeiture as applicable and restitution as appropriate.

(d) Defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for any loss caused to Medicare. Defendant agrees, pursuant to 18 U.S.C. §§ 3663(a)(3) and 3663A, that appropriate restitution, which represents the total amount of wrongful proceeds that defendant received from his participation in the unlawful healthcare kickback scheme:

| Victim | Restitution Amount |
|---|---|
| **Medicare** | $144,901 |

9

The parties understand that the Court makes any determination regarding apportionment of restitution pursuant to 18 U.S.C. § 3664(h). The restitution amount is based on the unlawful proceeds defendant received from his participation in the unlawful healthcare kickback scheme, as illustrated below:

| Date | Payments |
| --- | --- |
| Sept. 24, 2018 | $2,150 |
| Oct. 1, 2018 | $3,540 |
| Oct. 9, 2018 | $2,940 |
| Oct. 18, 2018 | $2,230 |
| Oct. 22, 2018 | $2,705 |
| Nov. 1, 2018 | $2,445 |
| Nov. 2, 2018 | $2,070 |
| Nov. 16, 2018 | $5,885 |
| Nov. 27, 2018 | $3,080 |
| Dec. 5, 2018 | $1,975 |
| Dec. 8, 2018 | $2,730 |
| Dec. 16, 2018 | $4,105 |
| Dec. 21, 2018 | $2,935 |
| Dec. 27, 2018 | $10,000 |
| Jan. 18, 2019 | $4,975 |
| Jan. 28, 2019 | $5,000 |
| Feb. 13, 2019 | $15,000 |
| Feb. 22, 2019 | $3,815 |
| Apr. 20, 2019 | $20,000 |
| May 23, 2019 | $8,821 |
| May 23, 2019 | $38,500 |
| **Total** | **144,901** |

(e) Pursuant to Rule 11(c)(1)(B), at sentencing, the United States agrees to recommend that, pursuant to U.S.S.G. § 2B1.1(b)(1)(E), the total loss amount is more than $95,000 but not more than $150,000. This recommendation is not binding on the Court, and in the event the Court rejects this recommendation, defendant may not withdraw his guilty plea or rescind this plea agreement.

7. No promises have been made by any representative of the United States to defendant as to what the sentence will be in this case. Any estimates or predictions made to

10

defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea(s). Defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. Defendant acknowledges that the sentencing determination will be based upon the entire scope of defendant's criminal conduct, his criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

8. Given defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of § 3E1.1(a) of the Sentencing Guidelines. Further, if defendant's offense level is 16 or greater, and defendant is awarded the two-level reduction pursuant to § 3E1.1(a), the United States agrees to move the Court, at or before the time of sentencing, to decrease the offense level by one additional level pursuant to § 3E1.1 (b) of the Sentencing Guidelines. Should defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for his offense, including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that defendant not receive any reduction for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines.

9. Defendant agrees to pay the special assessment in this case prior to sentencing.

10. Defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. Defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If defendant cannot pay the full amount immediately and is placed

11

in custody or under the supervision of the Probation Office at any time, defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. Defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. Defendant and counsel also agree that defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying defendant's counsel and outside the presence of defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, defendant agrees to disclose fully all assets in which he has any interest or over which he exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, defendant additionally agrees to the following specific terms and conditions:

(a) If so requested by the United States, defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form it provides and as it directs. Defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

(b) Defendant expressly authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate defendant's ability to satisfy any financial obligation imposed by the Court.

(c) If so requested by the United States, defendant will promptly execute authorizations on forms provided by the United States Attorney's Office to permit the United States Attorney's Office to obtain defendant's financial and tax records.

12

11. Defendant acknowledges that the principal benefits to the United States of this agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by the United States in this agreement and as a further demonstration of defendant's acceptance of responsibility for the offense committed, defendant voluntarily, knowingly, and intentionally agrees to the following:

(a) Defendant will not file a direct appeal of his conviction or sentence with one exception: defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. Defendant also waives the right to appeal the Court's determination as to whether his sentence will be consecutive or concurrent to any other sentence.

(b) Defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack his conviction or sentence, with two exceptions: defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

(c) Defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

12. This plea agreement becomes effective once it is signed by the parties and is not contingent on defendant's entry of a guilty plea. If the United States violates the terms of this agreement, defendant will have the right to withdraw from this agreement. If defendant violates the terms of this agreement in any way (including, without limitation, by failing to enter a guilty

13

plea as agreed herein, moving to withdraw guilty plea after entry, or by violating any court order or any local, state, or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute defendant for any and all federal crimes that he committed related to this case, including any charges that were dismissed and any other charges the United States agreed not to pursue. Defendant expressly waives any statute-of-limitations defense and any constitutional or speedy trial or double jeopardy defense to prosecution for the conduct covered by this agreement. Defendant also understands and agrees that a violation of this agreement by defendant does not entitle him to withdraw his guilty plea.

13. The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

14. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning defendant's guilty plea to the above-referenced charges. There are no other agreements, promises, undertakings, or understandings between defendant and the United States. The parties understand and agree that the terms of this agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

**For the United States**

J. Douglas Overbey
United States Attorney

____6-29-2020____  By:  _____/s/ William A. Roach, Jr._____
Date                      William A. Roach, Jr.
                          Assistant United States Attorney

**For the Defendant**

____06/27/2020____       _____/s/ Earl Pratt_____
Date                     Earl Pratt
                         Defendant

____6/27/20____          _____/s/_____
Date                     Matthew S. Chester
                         Attorney for Defendant